# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VICTOR LAVALLEE, derivatively on behalf of XEROX HOLDINGS CORPORATION,<br><br>   Plaintiff,<br><br>   vs.<br><br>STEVEN J. BANDROWCZAK, XAVIER HEISS, JOHN G. BRUNO, TAMI A. ERWIN, PRISCILLA HUNG, SCOTT LETIER, NICHELLE MAYNARD-ELLIOTT, EDWARD G. MCLAUGHLIN, JOHN J. ROESE, and AMY SCHWETZ,<br><br>   Defendants,<br><br>   and<br><br>XEROX HOLDINGS CORPORATION,<br><br>   Nominal Defendant. | Case No.: 1:25-cv-00371<br><br><br>**DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Victor LaVallee ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Xerox Holdings Corporation ("Xerox" or the "Company"), files this Verified Shareholder Derivative Complaint against Steven J. Bandrowczak ("Bandrowczak"), Xavier Heiss ("Heiss"), John G. Bruno ("Bruno"), Tami A. Erwin ("Erwin"), Priscilla Hung ("Hung"), Scott Letier ("Letier"), Nichelle Maynard-Elliott ("Maynard-Elliott"), Edward G. McLaughlin ("McLaughlin"), John J. Roese ("Roese"), and Amy Schwetz ("Schwetz") (collectively, the "Individual Defendants," and together with Xerox, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Xerox, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b),

and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Bandrowczak and Heiss for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Xerox, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.  This is a shareholder derivative action that seeks to remedy wrongdoing committed by Xerox's current and/or former officers and directors from January 25, 2024 to October 28, 2024, both dates inclusive (the "Relevant Period").

2.  Xerox is a New York corporation that represents itself to be "a workplace technology company, building and integrating software and hardware for enterprises large and small."[1] The Company represents that "[a]s customers seek to manage information and document workflows across digital and physical platforms," Xerox "delivers a seamless, secure, and sustainable experience."[2]

---

[1] https://www.sec.gov/ix?doc=/Archives/edgar/data/1770450/000177045024000012/xrx-20231231.htm
[2] *Id.*

3.      In October 2023, the Company began reorganizing its business, referring to the reorganization plan as the "Reinvention." The Company represented that the Reinvention consisted of a three-pronged approach: (1) geographic optimization, whereby Xerox would be more selective in directing its operations to certain markets and, when appropriate, would shift to a partner-led distribution model; (2) streamlining product offerings, including shifting Xerox's core business to increase focus on its emerging digital and IT services; and (3) increasing "operating efficiencies" through an "end-to-end organizational and structural simplification."

4.      On January 3, 2024, Xerox revealed the next step of its "operating model evolution" which would consist of, among other things, shifting to a "business unit operating model," consolidating groups under a "Global Business Services organization," and laying off 15% of Xerox's workforce.

5.      During the Relevant Period, the Individual Defendants repeatedly touted the success of Xerox's Reinvention plan, representing, among other things, that the Company was "expected to deliver $300 million of annual net adjusted operating income improvement above 2023 levels through 2026" and "more than one-third of that improvement in 2024." However, these rosy representations failed to disclose, *inter alia*, that the Reinvention had disrupted Xerox's salesforce productivity, which had led to a lower rate of sell-through of older products, and that, as a result of the foregoing, the Company was likely to experience lower sales and revenue.

6.      The truth regarding the effects of the Reinvention began to emerge before the market opened on April 23, 2024 when Xerox announced that, for the first quarter of the fiscal year ending December 31, 2024 (the "2024 Fiscal Year"): (1) the Company's quarterly revenue was down 12.4% year-over-year to $1.50 billion; (2) net loss was down $184 million year-over-year and had fallen to -$113 million; and (3) equipment sales declined 25.8% year-over-year to

$290 million. In part, Xerox conceded that "***geographic simplification***" had caused the year-over-year decline and further revealed that the Reinvention plan had been "***initially disruptive to sales operations***." However, in attempting to reassure investors, Xerox represented that it was "seeing the benefits of the new business unit-led operating model in equipment order momentum."

7.      On this news, the price per share of the Company's stock fell $1.66, or 10.11%, from a closing price of $16.42 per share on April 22, 2024 to close at $14.76 per share on April 23, 2024.

8.      The truth fully emerged before the market opened on October 29, 2024 when Xerox announced "***lower-than-expected improvements in sales force productivity***"[3] and revealed that "***delays in the global launch of two new products***" had caused "***sales underperformance***." Among other things, Xerox revealed that, for the third quarter of the 2024 Fiscal Year: (1) the Company's quarterly revenue was down 7.5% year-over-year to $1.53 billion; (2) net loss was down $1.3 billion year-over-year, falling to $1.2 billion; and (3) equipment sales fell 12.2% year over year to $339 million. On an earnings call Xerox hosted the same day to discuss these results, Defendant Bruno, the Company's Chief Operating Officer ("COO") and one of the its directors, disclosed that the product delay was in reality a "forecasting issue" where Xerox "***had higher expectations that we were going to flush through the older product***" which the Company needed to "***sell through***" in order to "make those transitions."

9.      On this news, the price per share of the Company's stock fell $1.79, or 17.41%, from a closing price of $10.28 per share on October 28, 2024 to close at $8.49 per share on October 29, 2024.

---

[3] All emphasis has been added unless otherwise noted herein.

4

10.    Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements that failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made materially false and misleading statements which failed to disclose, *inter alia*, that: (1) following a significant reduction in its workforce, Xerox's salesforce underwent a reorganization, which included new territory assignments and account coverage; (2) due to the foregoing, the productivity of Xerox's salesforce was detrimentally impacted; (3) as a result, Xerox experienced a lower rate of sell-through of older products; (4) obstacles arising from Xerox's need to flush out older product would delay the launch of Xerox's core products; and (5) due to the foregoing, the Company was likely to suffer from lower sales and revenue. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11.    The Individual Defendants further breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material facts.

12.    Additionally, the Individual Defendants caused the Company substantial harm by causing it to repurchase thousands of its own shares at artificially inflated prices. In total, the Company spent an aggregate amount of ***over $10.8 million*** to repurchase approximately 690,183 shares of its own common stock at artificially inflated prices from January 2024 to October 2024. In total, this caused the Company to overpay for repurchases of its own stock by over $4.9 million.

13.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a securities class action lawsuit pending in the United States District Court for the Southern District

of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Bandrowczak's and Heiss's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f) and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

20.     Plaintiff is a current shareholder of Xerox. Plaintiff has continuously held Xerox common stock at all relevant times.

21.     Plaintiff is a citizen of Georgia.

**Nominal Defendant Xerox**

22.     Xerox is a New York corporation with principal executive offices at 201 Merritt 7, Norwalk, Connecticut 06851. Xerox's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "XRX."

**Defendant Bandrowczak**

23.     Defendant Bandrowczak has served as the Company's CEO and as a Company director since August 2022. He previously served as the Company's President and Chief Operations Officer ("COO") from 2018 until his appointment as CEO in August 2022.

24.    For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Bandrowczak received $12,844,686 in total compensation from the Company. This included $1,000,000 in salary, $8,556,086 in stock awards, $3,278,700 in non-equity incentive plan compensation, and $9,900 in all other compensation.

25.    Upon information and belief, Defendant Bandrowczak is a citizen of Connecticut.

26.    The Schedule 14A the Company filed with the SEC on April 11, 2024 (the "2024 Proxy Statement") stated the following about Defendant Bandrowczak:

*Other Public Company Directorships (past 5 years):* None.

*Other Background:* Mr. Bandrowczak was named Chief Executive Officer of Xerox Holdings Corporation effective August 2022. He joined Xerox in 2018, as President and Chief Operations Officer. Prior to joining Xerox, Mr. Bandrowczak served as Chief Operating Officer and Chief Information Officer at Alight Solutions, where he was responsible for the application portfolio and technical infrastructure of the organization. Throughout his career, Mr. Bandrowczak also held senior leadership positions at various multi-billion-dollar global companies, including Avaya, Nortel, Lenovo, DHL and Avnet. Mr. Bandrowczak was a director of Fuji Xerox in 2019. He teaches "Leading Disruptive Change in Digital Economy" at Columbia University for the Master of Science program and is a mentor at Columbia University's Center for Technology Management.

**Defendant Heiss**

27.    Defendant Heiss has served as the Company's CFO since January 2021.

28.    For the 2023 Fiscal Year, Defendant Heiss received $5,427,795 in total compensation from the Company. This included $576,258 in salary, $3,178,745 in stock awards, $1,266,464 in non-equity incentive plan compensation, $197,405 in change in pension value and NQDC earnings, and $208,923 in all other compensation.

29.    Upon information and belief, Defendant Heiss is a citizen of Connecticut.

30.    The Company's website states the following about Defendant Heiss:

Xavier Heiss was named chief financial and business supporting functions officer, effective January 2021. In his role, Xavier oversees the company's finance

organization, including global corporate finance strategy, planning and analysis, Order to Cash, accounting, treasury, taxes, audit, enterprise risk management, Xerox™ Financial Services and Investor Relations.

Prior to his current role, Xavier served as interim chief financial officer beginning September 2020 and previously, he was the president of EMEA Operations. During his more than 30-year career with Xerox, he has held various finance and sales management roles in Europe and the U.S., including serving as chief financial officer of the company's Americas Operations. Before joining Xerox, Xavier held sales roles at Renault and Procter & Gamble.

Xavier is a Lean Six Sigma certified Black Belt and a former member of the Fujifilm Board. He is passionate about mentoring talented, diverse teams and nurturing a culture of inclusivity to drive positive business outcomes.

Xavier is also the executive sponsor of the Xerox's Veteran Service Members Association, one of Xerox's ten Employee Resource Groups.

Xavier graduated with a Master of Business Administration degree in information technology and finance from Reims Neomia International Business School and a certification in business and international finance from INSEAD, Fontainebleau, France. He is fluent in French and English.

**Defendant Bruno**

31.    Defendant Bruno has served as a Company director since May 2024 and as the Company's President and COO since 2022.

32.    For the 2023 Fiscal Year, Defendant Bruno received $7,345,309 in total compensation from the Company. This included $750,000 in salary, $4,499,898 in stock awards, $2,064,188 in non-equity incentive plan compensation, and $31,223 in all other compensation.

33.    Upon information and belief, Defendant Bruno is a citizen of Florida.

34.    The 2024 Proxy Statement stated the following about Defendant Bruno:

*Other Public Company Directorships (past 5 years):* Global Payments (NYSE: GPN).

*Other Background:* Mr. Bruno joined Xerox in 2022 as President and Chief Operating Officer, where he is responsible for the Print, Digital Services, and IT Services business units. Prior to joining Xerox, Mr. Bruno was CEO of Storm Ventures LLC. Mr. Bruno served as Chief Operating Officer of Aon, a global

professional services firm, and Chief Executive Officer of Data & Analytics Services. Prior to AON, Mr. Bruno was President, Industry & Field Operations and Executive Vice President of Corporate Development for NCR Corporation from 2014 to 2021. He has also held senior leadership positions with Goldman Sachs, Merrill Lynch, Cisco Systems, and United Parcel Services.

**Defendant Erwin**

35.     Defendant Erwin has served as a Company director since May 2024. She also serves as Chair of the Governance Committee and as a member of the Audit Committee.

36.     Upon information and belief, Defendant Erwin is a citizen of Colorado.

37.     The 2024 Proxy Statement stated the following about Defendant Erwin:

*Other Public Company Directorships (past 5 years):* John Deere (NYSE: DE), and F5 (NASDAQ: FFIV).

*Other Background:* Ms. Erwin is a veteran CEO, Fortune 500 director, and expert on digital transformation and growth. She served as EVP and CEO of Verizon Business Group from 2019 to 2022. Prior to becoming EVP and CEO, she served as EVP of Operations at Verizon from 2016 to 2019. Prior roles include: SVP of wireline ops, Chief Marketing Officer and numerous field roles. As EVP and CEO of Verizon Business, Ms. Erwin led more than 26,000 employees in 60 countries. Over three and a half years, she scaled an organization that delivered significant gains in profitability and revenue ($31+ billion in 2022), and advanced Verizon's leadership in 5G technology.

Ms. Erwin built a culture known for high performance, inclusivity, and belonging. Erwin is on the boards of John Deere, F5, York Space Systems and Skylo. She is a member of the advisory council of Dublin-based Aptiv, an Operating Partner with UK based infrastructure investment group Digital Gravity, an Advisor to the CEO at Cohesity, a Senior Fellow of Mission Possible Partnership, and a Champion in JOURNEY, a nonprofit that works to advance diversity at the top of the private sector.

**Defendant Hung**

38.     Defendant Hung has served as a Company director since May 2024. She also serves as a member of the Governance Committee and the Finance Committee.

39.     Upon information and belief, Defendant Hung is a citizen of California.

40.     The 2024 Proxy Statement stated the following about Defendant Hung:

Other Public Company Directorships (past 5 years): Veeva Systems (NYSE: VEEV), Vonage Holdings

*Other Background:* Ms. Hung became Senior Advisor to Guidewire Software, a provider of cloud-based software for the insurance industry in 2024 after serving in various management roles since 2005, most recently as President and Chief Operating Officer from 2020 to 2023. Prior to that, Ms. Hung held senior roles at various companies including Ariba Technologies and Sun Microsystems. She is currently a member of the board of directors of Veeva Systems, where she is also a member of the audit committee. She also serves as a member of the board of directors of Ethos Life, a privately held insurance company, and Waystar, a company that offers a technology platform for healthcare revenue cycle management solutions. Ms. Hung was also a director of Vonage Holdings from 2019 until its acquisition in 2022.

### **Defendant Letier**

41.     Defendant Letier is Chairman of the Board and has served as a Company director since 2018. He also serves as Chair of the Finance Committee and as a member of the Governance Committee.

42.     Upon information and belief, Defendant Letier is a citizen of Texas.

43.     The 2024 Proxy Statement stated the following about Defendant Letier:

*Other Public Company Directorships* (past 5 years): Conduent Incorporated (NASDAQ: CNDT).

*Other Background:* Mr. Letier has been Chief Investment Officer and Managing Director of Deason Capital Services, LLC ("DCS") since July 2014. Prior to joining DCS, Mr. Letier was the Managing Director of JFO Group, LLC, the family office for the Jensen family, from September 2006 to July 2014. Mr. Letier has over 20 years of prior leadership roles serving as a private equity investment professional and chief financial officer, and began his career in the audit group at Ernst & Whinney (now Ernst & Young). Mr. Letier has served on numerous boards in the past, and currently serves as Chairman of the Board of Directors of Conduent Incorporated, a provider of business process outsourcing services, and on the boards of several private companies, including Colvin Resources Group, a Dallas based search and staffing firm, File & ServeXpress, LLC, an electronic filing, process service, and secure document exchange platform serving the legal system, Gardenuity, Inc., a tech enabled wellness and e-commerce company, and he serves on the fund advisory board of Anchor Capital GP, a private equity firm, and Griffis Residential, a Denver based multi-family real estate management and investment firm. Mr. Letier is a Certified Public Accountant.

**Defendant Maynard-Elliott**

44.    Defendant Maynard-Elliott has served as a Company director since 2021. She also serves as Chair of the Compensation Committee and as a member of the Audit Committee.

45.    Upon information and belief, Defendant Maynard-Elliott is a citizen of New York.

46.    The 2024 Proxy Statement stated the following about Defendant Maynard-Elliott:

*Other Public Company Directorships (past 5 years):* Element Solutions Inc. (NYSE: ESI); Lucid Group, Inc. (NASDAQ: LCID).

*Other Background:* Ms. Maynard-Elliott was Executive Director, Mergers & Acquisitions, for Praxair, Inc., a worldwide industrial gases company, from July 2011 to May 2019, where among other things, she advised Praxair on its $90 billion merger in 2018 with the Linde Group. She was responsible for evaluating and negotiating global acquisitions, divestitures, joint ventures, and other business combinations. Ms. Maynard- Elliott joined Praxair in 2003. Prior to Praxair, Ms. Maynard-Elliott served as an associate at the law firms of Kelley Drye & Warren LLP, Pryor Cashman LLP, and Weil, Gotshal & Manges LLP. Ms. Maynard-Elliott has served as an independent director of Element Solutions Inc., a global specialty chemicals firm, since 2018 and currently serves as Chair of its Audit Committee. Ms. Maynard-Elliott has served as an independent director of Lucid Group, Inc., a manufacturer of electric vehicles, since 2021, and currently serves as a member of its Nomination and Governance Committee, and Compensation and Human Capital Committee. She also serves as a trustee of The Advisor's Inner Circle Fund III (and Affiliated Trusts), and Chair of its Governance Committee, and as a director of Chiron Capital Allocation Fund Ltd. and Chair of its Governance Committee. In addition, over the course of her executive and legal careers, Ms. Maynard-Elliott has been actively involved in seeking to influence and develop diverse and inclusive cultures in traditionally white male-dominated environments.

**Defendant McLaughlin**

47.    Defendant McLaughlin has served as a Company director since May 2024. He also serves as a member of the Governance Committee and the Compensation Committee.

48.    Upon information and belief, Defendant McLaughlin is a citizen of Missouri.

49.    The 2024 Proxy Statement stated the following about Defendant McLaughlin:

*Other Public Company Directorships* (past 5 years): None.

*Other Background:* Mr. McLaughlin is the President and Chief Technology officer of Mastercard and a member of the company's executive committee since 2017. He oversees the company's technology functions, including the global payments network, enterprise platforms, technology infrastructure and operations, information security, and global technology hubs. Prior to this role, he served as chief information officer, directing the development of Mastercard products and services. Prior to joining Mastercard in 2005, Mr. McLaughlin was group vice president, products and strategy at Metavante (now FIS) which he joined in 2002 through acquisition of Paytrust, an online payments company of which he was co-founder and CEO. Prior to co-founding Paytrust, Mr. McLaughlin was the executive vice president of product and marketing at LogicWorks, Inc., a data modeling software company. He is a graduate of the University of Pennsylvania, Wharton School of Business and a founding member of the Harvard Kennedy School's Council on the Responsible Use of Artificial Intelligence. Mr. McLaughlin was awarded the Forbes CIO Innovation Award for 2019, and named to the CIO Magazine Hall of Fame in 2024.

**<u>Defendant Roese</u>**

50.    Defendant Roese has served as a Company director since May 2024. He also serves as a member of the Audit Committee and the Finance Committee.

51.    Upon information and belief, Defendant Roese is a citizen of Massachusetts.

52.    The 2024 Proxy Statement stated the following about Defendant Roese:

*Other Public Company Directorships* (past 5 years): None

*Other Background:* Mr. Roese has served as Global Chief Technology Officer at Dell Technologies since 2019. In this role, Mr. Roese is responsible for establishing the company's future-looking technology strategy and fostering a culture of innovation to make sure Dell Technologies is at the forefront of the industry and anticipating customers' technology needs, even before they arise. Mr. Roese was Chief Technology Officer at Dell Technologies and EMC Corporation from 2012 to 2019. Prior to joining Dell EMC in 2012, Mr. Roese was the CTO, GM, and leader of several technology companies including EMC, Nortel, Broadcom, Futurewei, Enterasys, and Cabletron systems. Mr. Roese is an established conference speaker, published author, and holds more than 20 pending and granted patents in areas such as policy-based networking, location-based services, and security. Mr. Roese has been active in numerous boards, including ATIS, OLPC, Blade Networks, Pingtel, Nexoya, Bering Media, Cloud Foundry Foundation, NYU Wireless Industry Advisory Board, and the Federal Communications Commission (FCC) Communications Security, Reliability, and Interoperability Council. He currently serves on the Open Secure Software Foundation board of directors, and

the Purdue Research Foundation / Purdue University Lab to Life Technology Leaders Advisory Board.

**Defendant Schwetz**

53.     Defendant Schwetz has served as a Company director since May 2024. She also serves as Chair of the Audit Committee and as a member of the Compensation Committee.

54.     Upon information and belief, Defendant Schwetz is a citizen of Texas.

55.     The 2024 Proxy Statement stated the following about Defendant Schwetz:

*Other Public Company Directorships* (past 5 years): Dril-Quip (NYSE: DRQ).

*Other Background:* Ms. Schwetz has served as SVP & Chief Financial Officer of Flowserve, a manufacturer of industrial equipment and aftermarket service provider, since 2020. From 2005-2020, Ms. Schwetz held various management roles at Peabody Energy, where she most recently served as EVP & Chief Financial Officer. Ms. Schwetz began her career at Ernst & Young, where she was an audit manager. She is currently a member of the board of directors of Dril-Quip, where she serves as chair of the audit committee and also serves on the compensation, governance, and nomination committees.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

56.     By reason of their positions as officers, directors, and/or fiduciaries of Xerox and because of their ability to control the business and corporate affairs of Xerox, the Individual Defendants owed Xerox and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Xerox in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Xerox and its shareholders so as to benefit all shareholders equally.

57.     Each director and officer of the Company owes to Xerox and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

58.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Xerox, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

59.     To discharge their duties, the officers and directors of Xerox were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

60.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Xerox, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Xerox's Board at all relevant times.

61.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

62.    To discharge their duties, the officers and directors of Xerox were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Xerox were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New York, Connecticut, and the United States, and pursuant to Xerox's own Code of Business Conduct (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Xerox conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Xerox and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)  maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Xerox's operations would comply with all applicable laws and Xerox's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)  exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)  refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)  examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

63.  Each of the Individual Defendants further owed to Xerox and the shareholders the duty of loyalty requiring that each favor Xerox's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

64.  At all times relevant hereto, the Individual Defendants were the agents of each other and of Xerox and were at all times acting within the course and scope of such agency.

65.  Because of their advisory, executive, managerial, directorial, and controlling positions with Xerox, each of the Individual Defendants had access to adverse, non-public information about the Company.

66.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Xerox.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

67.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

68.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

69.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Xerox was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

70.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

71.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Xerox and was at all times acting within the course and scope of such agency.

### XEROX'S CODE OF CONDUCT

72.     Xerox's Code of Conduct states that it "applies to all Xerox employees and those who do business on [Xerox's] behalf." With respect to its "Purpose and Scope," the Code of Conduct states:

> The Code of Business Conduct is designed to assist us in aligning our actions and decisions with our core values and compliance requirements as we pursue our mission. It is intended to help us recognize ethics and compliance issues before they arise and to deal appropriately with those issues that do occur. The Code is not intended to be a compendium of policies or an exhaustive list of legal and compliance requirements. We have many policies that impact your job, and you should be aware of those that affect you. A compilation of many of these policies is accessible at the Ethics and Policies MyXerox Page on our intranet. The Code is intended to set the tone for how we work at Xerox. It is more than words written on paper. It's how we do business every day.
>
> The Code of Business Conduct applies to all Xerox employees and those who do business on our behalf. The Company enforces compliance with the Code of Business Conduct and all Company policies and procedures through appropriate disciplinary action up to and including termination of employment and legal action. Members of the Xerox Board of Directors are also subject to a separate Board of Director's Code of Conduct, which creates additional obligations based on their responsibilities as Board members. Similarly, our financial personnel are also subject to a separate Xerox Finance Code of Conduct. Finally, our contractual agreements require that third parties,  such as agents, resellers, and independent contractors, comply with our Code of Business Conduct when acting on  our behalf.

73.     In the section "Reporting a Concern and Obtaining Guidance," the Code of Conduct states the following, in relevant part:

Ethical breaches and non-compliance must be reported. You should only report concerns or suspected violations if you are doing so in good faith. Abuse of the Ethics Helpline or another reporting process to intentionally harass someone or to knowingly file false information will not be tolerated. We provide a variety of channels for employees, suppliers, and customers to receive guidance regarding ethics and compliance issues and to report suspected ethical violations. These channels include the Ethics Helpline, e-mail, Internet reporting, and both internal and external mail addresses.

74.     In the section "Legal and Policy Controls," the Code of Conduct states the following, in relevant part:

As a global enterprise, we operate in over 160 countries worldwide. We conduct our business activities in compliance with our Code of Business Conduct, policies, standards, guidelines, and procedures as well as with the laws and regulations of the countries where we do business. Our Code is designed to meet or exceed existing legal and compliance requirements.  If these requirements are found to be less than what is required by our Code of Business Conduct and our policies, we must take the higher ground and follow our Code of Business Conduct and our policies. If following our Code or compliance requirements conflicts with local laws and regulations, please contact the Business Ethics & Compliance Office by filing a report with Xerox Ethics Helpline. We are each accountable to know the legal and policy controls that apply to our jobs. If we have any questions about our obligations under our Code of Business Conduct or about our policy or legal obligations, we should seek guidance from our local management, Human Resources, the Office of General Counsel (OGC), and/ or the Business Ethics & Compliance Office. If we become aware of any questionable activity or potential violation, we must report it to our management or other appropriate channel.

75.     In the section "Corporate Records – Creation and Management," the Code of Conduct states the following:

Accurately and honestly preparing Corporate Records, including expense reports, time reporting, and financial statements, is a business and legal imperative. We classify, use, and handle Corporate Records in accordance with Xerox policies. We take our obligation to maintain Corporate Records for operational, legal, financial, historical,  and other purposes seriously and take appropriate steps to ensure that the content, context, and structure of our records are reliable and authentic.  We manage records consistent with the retention and destruction guidelines applicable

to our functions. We preserve pertinent records after having received legal notice of a pending lawsuit. Records, both electronic and hard copy, receive the same consideration regardless of their format.

76.    In the section "Conflicts of Interest," the Code of Conduct states the following:

We carry out our duties and responsibilities in a fair, objective manner. We make business decisions in the best interest of our Company, free from personal or external influences. Conflicts of interest can occur anytime your personal interests might benefit from your actions or influence as a Xerox employee. Outside business interests with our vendors, suppliers, customers, or competitors are a particular cause of concern. Having outside business interests that interfere with your obligation to devote your time and attention to your job responsibilities or behaving in a manner that reflects adversely on Xerox can result in a conflict of interest. Employees are obligated to disclose any outside business interests that they, or their immediate family members, have  to their manager. It is important to disclose relevant facts before you, or your immediate family members, become involved in or acquire a financial interest  in an outside business and to take any actions we require to resolve any potential conflict of interest that is identified.

77.    In the section "Insider Trading and Insider Information," the Code of Conduct states

the following, in relevant part:

We handle insider information appropriately and lawfully. Insider information is defined generally as material, non-public information. Material information is information that  is important enough to affect an  investor's decision to buy, sell, or hold securities. Our employees, their immediate family, and anyone living in the same home are considered insiders under Xerox policy. As such, you may not engage in speculative trading of Xerox securities, including Xerox common stock, debentures, or notes. You should buy Xerox stock for investment purposes only, generally holding the stock for at least six months.  Xerox policy and securities laws provide  for additional rules for insiders who have actual knowledge of market-sensitive information about the Company that  has not been disclosed to the public. Examples of market-sensitive information include financial performance, acquisitions, disposals, significant new products or technologies, changes in dividends, and lawsuits.

***

Officers, Directors, and members of the Executive Committee, by virtue of their position in the Company, are subject to more restrictive policies and laws relating specifically to them. Officers, directors, and other designated individuals may buy and sell the Company's securities only during a window period. The window period begins on the first full trading day after the Company publicly discloses its quarterly financial results and ends at the close of market on the 15th calendar day prior to the end of each fiscal quarter or year. In addition, members of the Executive Committee, members of the Board of Directors and certain other executives must

obtain pre-clearance from Xerox's General Counsel prior to transacting in the Company's securities.

78.    In the section "Expectation for Compliance," the Code of Conduct states the

following:

> We each have an individual responsibility to live up to the highest ethical standards of business conduct. This Code outlines our expectations regarding our behavior. Failure to live up to our values and compliance standards may result in disciplinary action, which could include termination for serious offenses.

## CORPORATE GOVERNACE GUIDELINES

79.    The Company also maintains Corporate Governance Guidelines. The Corporate

Governance Guidelines state the following, in relevant part, about the responsibilities of the Board:

> The Company's Board of Directors represents the owners' interest in the operation of a successful business, including optimizing long-term financial returns. The Board is responsible for determining that the Company is managed in such a way to ensure this result, which will also assure the company's vitality for its customers, employees and the other individuals and organizations that depend on it. This is an active, not a passive, responsibility. The Board has the responsibility to ensure that in good times, as well as difficult ones, management is capably executing its responsibilities.
>
> The Board's responsibility is to regularly monitor the effectiveness of management policies and decisions including the creation and execution of its strategies. The Board is also responsible for monitoring the establishment and enforcement of procedures designed to ensure that the Company's management and employees operate in a legal and ethically responsible manner. When it is appropriate or necessary, it is the Board's responsibility to remove the Chief Executive Officer and to select his or her successor.
>
> To achieve the above goals, the Board will monitor the performance of the Company (in relation to its goals, strategy and competitors) and the performance of the Chief Executive Officer and offer advice and feedback.

80.    Additionally, the Corporate Governance Guidelines emphasize that the Board's

role is largely as follows:

> The business of the Company is managed under the direction of the Board. Normally it is management's job to formalize, propose and implement strategic choices, and the Board's role to approve strategic direction and evaluate strategic

results. However, as a practical matter, the Board and management will be better able to carry out their respective responsibilities if there is an ongoing dialogue among the Chief Executive Officer, other members of top management and Board members. To facilitate such discussions, the Board conducts an annual review of the Company's long-term strategic plans and principal issues. Periodically during the year, the Board receives strategy updates from members of senior management of the Company.

Directors are expected to spend the time and effort necessary to properly discharge their responsibilities. Accordingly, a Director is expected to regularly attend meetings of the Board and committees on which he or she sits, and to review prior to meetings material distributed in advance for such meetings. A Director who is unable to attend a Board or Committee meeting (which, it is understood will occur on occasion) is expected to notify the Secretary of the Company who will advise the Chairman of the Board and/or the Chairperson of the relevant Committee. All Directors are expected to attend the Company's Annual Meeting of Shareholders.

81.    In violation of the Code of Conduct and the Corporate Governance Guidelines, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## AUDIT COMMITTEE CHARTER

82.    The Company also maintains an Audit Committee Charter. Under a section titled "Purpose and Authority," the Audit Committee Charter states the following:

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Xerox Holdings Corporation (the "Company") shall be to assist in Board oversight over: ☐ the integrity of the Company's financial statements and the effectiveness of internal controls over financial reporting, ☐ the Company's compliance with legal and regulatory requirements, ☐ the independent auditors' (the "Auditors") qualifications and independence, ☐ the performance of the

Auditors, ☐ the performance of the internal audit function, ☐ the Company's process for assessing and managing risk, ☐ the Company's code of business conduct and ethics, and ☐ the preparation of the audit committee report that the rules of the Securities and Exchange Commission (the "SEC") require to be included in the Company's annual proxy statement. References herein to any term or provision of any law, rule or regulation shall include all amendments, restatements, supplements, or modifications thereof, and all successor, replacement or redesignated terms or provisions thereto.

83.     Under a section titled "Duties and Responsibilities of the Committee," the Audit

Committee Charter states the following, in relevant part:

The Committee's function is one of oversight. The Company's management is responsible for preparing the Company's financial statements and, along with the internal auditors, for developing and maintaining systems of internal and financial controls, while the Auditors will assist the Committee and the Board in fulfilling their responsibilities for their review of these financial statements and internal controls. While the Committee has the responsibilities and powers set forth herein, it is not the duty of the Committee to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and are in accordance with generally accepted accounting principles. Management is responsible for the quality, accuracy and integrity of the Company's accounting practices, financial statements and reporting and system of internal control. The Auditors are responsible for performing an audit of the Company's financial statements, and, where applicable, an audit of the Company's internal control over financial reporting. Consequently, in fulfilling its oversight responsibilities, the Committee does not provide any expert or special assurance as to the Company's financial statements or internal controls or any professional certification as to the Auditors' work.

84.     In the section "Internal Audit Responsibilities," the Audit Committee Charter states

the following responsibilities of the Audit Committee:

1. Review the activities, organization, resources, and qualifications of the Chief Audit Executive and of the internal audit organization. At least annually, the Committee, shall review and approve the compensation of the CAE.

2. At least annually, approve the internal audit plan and review the progress made with respect to executing the approved internal audit plan as well as any modifications made to the plan during the year.

85.     In the section "System of Internal Controls," the Audit Committee Charter states

the following responsibilities of the Audit Committee:

1. At least quarterly, the Committee shall meet with management, the internal auditors, and the Auditors in separate executive sessions.

2. Review with management, the Auditors, and the internal auditors the quality and adequacy of internal controls that could significantly affect the Company's financial statements, including any changes, significant deficiencies or material weaknesses in those controls that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial data and any special audit steps adopted in light of significant control deficiencies.

3. Review with management, the Auditors, and the internal auditors any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls and/or the preparation of the Company's financial statements.

4. Review and make recommendations to the Board concerning the Company's policies with regard to affiliate transactions which could have an impact on the Company's financial results or internal controls of financial reporting.

86.    In the section "Risk Management," the Audit Committee Charter states that the

Audit Committee shall, *inter alia*:

1. Discuss with management, the Auditors and the internal auditors the Company's major financial risk exposures, the Company's policies with respect to risk assessment and risk management and the steps management has taken to monitor and control these exposures.

2. Discuss with management the Company's major non-financial risk exposures, including with respect to ethics, litigation, information and cybersecurity, data security and privacy matters, the Company's policies with respect to such risk assessment and risk management and the steps management has taken to monitor and control these exposures.

3. At least annually, oversee the Company's Enterprise Risk Management assessment and process for subsequent review by the Board of Directors.

87.    In the section "Financial Reporting Process and Financial Statements," the Audit

Committee Charter states the following responsibilities of the Audit Committee:

1. Discuss with management and the Auditors the quality and adequacy of the Company's disclosure controls and procedures, and review disclosures in the Company's periodic reports filed with the SEC regarding such controls and procedures.

2. Prior to each quarterly earnings release, discuss with management and the Auditors the earnings press release. Discuss with management the Company's policies with respect to the types of information and type of presentation to be used in earnings releases and in providing financial information and earnings guidance to the public.

3. Meet to review and discuss with management and the Auditors the Company's quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to filing the same in Quarterly Reports on Form 10-Q.

4. Meet to review and discuss with management and the Auditors the annual audited financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", any changes in accounting policies and practices, financial reporting practices and significant reporting issues, critical accounting policies and significant estimates and judgments made in connection with the preparation of such audited financial statements, prior to filing the same in Annual Reports on Form 10-K.

5. Review with management and the Auditors the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

6. Review with, and make a recommendation to, the Board with respect to the inclusion of the audited financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", in the Company's Annual Report to Shareholders and in the Company's Form 10-K to be filed with the SEC.

7. Prepare the report from the Committee required by the rules of the SEC to be included in the Company's annual proxy statement.

88.    In the section "Compliance with Laws and Regulations," the Audit Committee Charter states the following responsibility of the Audit Committee:

Review with the Company's General Counsel legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or government agencies.

89.    In the section "Compliance with the Company's Codes of Conduct," the Audit Committee Charter states the following responsibilities of the Audit Committee:

1. Ensure that the Company's Ethics Policy and Finance Code of Conduct (the "ethics codes") are in writing and have annually been distributed to applicable Company employees, Directors and other individuals covered by its contents.

2. Review at least annually with the Company's Chief Ethics Officer the process for monitoring compliance with the ethics codes. Establish and maintain procedures for reviewing, granting and, to the extent required by law, regulation, or Nasdaq Rules, promptly disclosing any waivers of the ethics codes for directors and executive officers.

3. Establish and maintain a procedure for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and investigating such matters. Additionally, establish and maintain procedures for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters and investigations of the same.

4. The Company's Chief Ethics Officer shall (a) have the authority to communicate personally to the Committee promptly on any matter involving criminal conduct or potential criminal conduct that poses a substantial risk to the Company and (b) communicate personally to the Committee regularly, but not less than annually, on the implementation and effectiveness of the Company's compliance and ethics program.

90.    In the section "Reporting and other Responsibilities," the Audit Committee states

the following responsibilities of the Audit Committee:

1. Annually review and reassess the adequacy of the Committee's purpose and responsibilities as herein set forth and recommend any proposed changes to the Board for approval.

2. The Committee has the authority, without having to seek Board approval, and appropriate funding from the Company to obtain advice and assistance, as appropriate, from outside legal, accounting, and other advisers, as it determines necessary to carry out its duties. The Committee may also conduct or authorize investigations into or studies of matters within the Committee's scope of responsibilities. The Committee shall have the authority to direct the Company to pay any ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

3. The Committee shall review at least quarterly with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Auditors, or the performance of the internal audit function.

4. The Committee shall perform, at least annually, an evaluation of its own performance, and submit that evaluation, including any recommended changes to the Committee's membership, charter, or procedures, to the Board for review and discussion.

5. The Chairman of the Committee shall report to the Board at each meeting of the Board the deliberations, actions, and recommendations of the Committee since the last Board meeting and such other matters as the Board shall from time to time specify.

6. At least annually, review the Company's pledging program and pledging activity, if any, and to make recommendations to the Board, with respect to the same

91.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Relevant Background*

92.    Xerox is a New York corporation that represents itself to be "a workplace technology company, building and integrating software and hardware for enterprises large and small."[4] The Company represents that "[a]s customers seek to manage information and document

---

[4] https://www.sec.gov/ix?doc=/Archives/edgar/data/1770450/000177045024000012/xrx-20231231.htm

workflows across digital and physical platforms," Xerox "delivers a seamless, secure, and sustainable experience."[5]

93.     In October 2023, the Company began reorganizing its business, referring to the reorganization plan as the "Reinvention." The Company represented that the Reinvention consisted of a three-pronged approach: (1) geographic optimization, whereby Xerox would be more selective in directing its operations to certain markets and, when appropriate, would shift to a partner-led distribution model; (2) streamlining product offerings, including shifting Xerox's core business to increase focus on its emerging digital and IT services; and (3) increasing "operating efficiencies" through an "end-to-end organizational and structural simplification."

94.     On January 3, 2024, Xerox revealed the next step of its "operating model evolution" which would consist of, among other things, shifting to a "business unit operating model," consolidating groups under a "Global Business Services organization," and laying off 15% of Xerox's workforce.

## FALSE AND MISLEADING STATEMENTS

### January 25, 2024 Press Release

95.     The Relevant Period began on January 25, 2024 when the Company issued a press release announcing its financial results for the fourth quarter and full 2023 Fiscal Year. The press release boasted of Xerox's Reinvention plan, representing that it had "***led 170 basis points of adjusted operating margin expansion.***" In addition, the press release represented that any decline Xerox had experienced with respect to its equipment sales was merely due to the "***prior year effect of backlog reduction.***"

---

[5] *Id.*

96.     The press release also: (1) announced the Company's guidance for the full 2024 Fiscal Year, including a decline of 3% to 5% in constant currency for revenue and an adjusted operating margin of at least 7.5%; and (2) represented that the guided year-over-year decline in revenue was caused by only the "**headwind from prior-year backlog reduction**" and the "**deemphasis of certain non-strategic revenue**." In particular, the press release stated the following, in relevant part:

> *"Last year, steps we took to structurally simplify our business impacted revenue but led to 170 basis points of adjusted operating margin expansion and laid the foundation for successful execution of our Reinvention,"* said Steve Bandrowczak, chief executive officer at Xerox.

* * *

**Full-Year Key Financial Results**

| (in millions, except per share data) | FY 2023 | FY 2022 | B/(W) YOY | % Change B/(W) YOY |
|---|---|---|---|---|
| Revenue | $6,886 | $7,107 | $(221) | (3.1)% AC (3.3)% CC[1] |
| Gross Margin | 33.6% | 32.6% | 100 bps | |
| RD&E % | 3.3% | 4.3% | 100 bps | |
| SAG % | 24.6% | 24.8% | 20 bps | |
| Pre-Tax (Loss)[2] | $(28) | $(325) | $297 | NM |
| Pre-Tax (Loss) Margin[2] | (0.4)% | (4.6)% | 420 bps | |
| Operating Income - Adjusted [1] | $389 | $275 | $114 | 41.5% |
| Operating Income Margin - Adjusted [1] | 5.6% | 3.9% | 170 bps | |
| GAAP Diluted (Loss) per Share[2] | $(0.09) | $(2.15) | $2.06 | NM |
| Diluted Earnings Per Share - Adjusted [1] | $1.82 | $1.12 | $0.70 | 62.5% |

* * *

## 2024 Guidance

•*Revenue: decline of 3% to 5% in constant currency*

•*Adjusted operating margin: at least 7.5%*

•Free cash flow: at least $600 million

The company expects stable Print demand, growth in Digital and IT Services and neutral macroeconomic conditions. ***The guided year-over-year decline in revenue is attributable to the following: around 200 basis points of headwind from prior year backlog reduction and around 200 basis points from the deemphasis of certain non-strategic revenue, including lower sales of paper.*** Margin guidance implies adjusted operating income margin improvement of more than 190 basis points, and adjusted operating income improvement of more than $100 million, year-over-year.

The company reiterates its three-year target of $300 million of incremental adjusted operating income above 2023 levels and a return to double-digit adjusted operating income margin by 2026.

\* \* \*

***Equipment sales of $458 million in the fourth quarter 2023 declined 17.3% in actual currency, or 18.3% in constant currency, as compared to the fourth quarter 2022. The prior year effect of backlog reduction drove more than a 25-percentage point year-over-year decline***. Total equipment revenue outpaced equipment installation activity, due to favorable product mix. Installations of High-End color equipment, which were less affected by prior year backlog reductions, increased as compared to fourth quarter 2022, while Entry and Mid offerings declined. Declines in entry primarily reflect prior year reductions to backlog and current year constraints.

\* \* \*

We expect 2024 pre-tax income and adjusted operating income margins to improve in 2024 to approximately 5.1% and at least 7.5%, respectively. The increase in profit margins will primarily be driven by structural simplification actions enabled by our reorganization, including the effects of the workforce reduction decisions announced in January 2024.

### February 1, 2024

97.     On February 1, 2024, Xerox issued a press release announcing that it was launching "a collection of new solutions and services" which promoted Xerox's new VersaLink products, which would purportedly "***be available in all regions by the end of March.***" In relevant part, the press release stated:

The following updates are the latest in a recent surge of print, document management and workflow automation innovations designed for hybrid workers:

• **Xerox® VersaLink® C415/B415/C625/B625 MFPs and the Xerox® VersaLink C620/B620** – Completing a total refresh of its A4 printers and multifunction printers (MFPs), the Xerox VersaLink family enables more than just print. The MFPs use machine learning to recognize common tasks and suggest more efficient processes, eliminating programming steps and saving valuable time. High-capacity scanning quickly turns hardcopy into digital files and initiates digital workflows.

\* \* \*

• ***The Xerox VersaLink C415/B415/C625/B625 MFPs and the Xerox VersaLink C620/B620 will be available in all regions by the end of March.***

### February 23, 2024 Form 10-K

98.    On February 23, 2024, Xerox filed its annual report on Form 10-K with the SEC for the 2023 Fiscal Year (the "2023 10-K"), wherein the Company affirmed the previously reported financial reports. The 2023 10-K was signed by Defendants Bandrowczak, Heiss, Letier, and Maynard-Elliott and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Bandrowczak and Heiss attesting to its accuracy. With respect to the Reinvention plan, the 2023 10-K touted its success, stating that it "is expected to deliver $300 million of annual net adjusted operating income improvement above 2023 levels through 2026" and "more than one-third of that improvement in 2024." Regarding costs of restructuring and the potential risks presented by the Reinvention, the 2023 10-K represented the following, in relevant part:

> In January 2024, we announced a significant reorganization of our business, including the adoption of a business unit-led operating model, a greater focus on partner-led distribution and the establishment of a Global Business Services (GBS) organization to enable enterprise-wide efficiencies and productivity gains. These changes are expected to both strengthen our core business and position us to capture new, ancillary revenue opportunities over time. ***Reinvention is expected to deliver $300 million of annual net adjusted operating income improvement above 2023 levels through 2026, and we expect to achieve more than one-third of that improvement in 2024,*** due in large part to organizational cost savings associated with the restructuring action that was announced in January 2024. Operating profit improvement will be driven by three concurrent efforts over the next three years:
>
> \* \* \*
>
> **Structural Cost Improvements:** We continue to implement structural cost improvements to drive higher profitability and total shareholder returns. ***Our newly formed GBS organization will drive enterprise-wide efficiency and scalability by centrally coordinating internal processes. GBS serves as a catalyst for organizational savings in 2024 and an engine for continuous cost improvement going forward. The optimization of our geographic footprint and product offerings are also expected to generate profit improvements in 2024.***
>
> \* \* \*
>
> **Note 13 – Restructuring Programs**
> We engage in restructuring actions and other transformation efforts in order to reduce our cost structure and realign it to the changing nature of our business. As part of our efforts to reduce costs, our restructuring actions may also include the

offshoring and/or outsourcing of certain operations, services and other functions, as well as reducing our real estate footprint.

Restructuring and related costs, net reflect the following components for the three years ended December 31, 2023, 2022 and 2021:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2023 | | 2022 | | 2021 |
| Restructuring charges, net | $ | 114 | $ | 68 | $ | 18 |
| Asset impairment charges, net | | 32 | | (6) | | 9 |
| Related costs, net | | 21 | | 3 | | 11 |
| Total Restructuring and related costs, net | $ | 167 | $ | 65 | $ | 38 |

\* \* \*

Our Reinvention entails the implementation of a new business-unit led operating model and the central coordination of internal processes through a new Global Business Services organization.

***As part of our efforts to streamline operations and reduce costs, we have offshored and outsourced certain of our operations, services and other functions through arrangements with third parties*** (e.g., TCS and HCL) and we will continue to evaluate additional offshoring or outsourcing possibilities in the future. ***If our outsourcing partners fail to perform their obligations in a timely manner or at satisfactory quality levels or if we are unable to attract or retain sufficient personnel with the necessary skill sets to meet our offshoring or outsourcing needs, the quality of our services, products, and operations, as well as our reputation, could suffer.*** In addition, much of our offshoring takes place in developing countries and as a result may also be subject to geopolitical uncertainty. ***Diminished service quality from offshoring and outsourcing could have an adverse material impact to our operating results due to service interruptions and negative customer reactions.***

99.     The statements in ¶¶95-98 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) following a significant reduction in its workforce, Xerox's salesforce underwent a reorganization, which included new territory assignments and account coverage; (2) due to the foregoing, the productivity of Xerox's salesforce was detrimentally impacted; (3) as a result, Xerox experienced a lower rate of sell-through of older products; (4) obstacles arising from Xerox's need to flush out older product would delay the launch of Xerox's core products; and (5) due to the foregoing, the Company was likely to suffer from lower sales and revenue. As a result of the foregoing, the Individual Defendants' statements about the Company's

business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2024 Proxy Statement*

100.    On April 11, 2024, the Company filed its 2024 Proxy Statement with the SEC. Defendants Bandrowczak, Maynard-Elliott, and Letier, among others, solicited the 2024 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act and contained material misstatements and omissions.

101.    The 2024 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) elect Defendants Bandrowczak, Bruno, Erwin, Hung, Letier, Maynard-Elliott, McLaughlin, Roese, and Schwetz to the Board; (2) ratify the appointment of PricewaterhouseCoopers LLP ("PwC") as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve, on an advisory basis, the 2023 compensation of Xerox's named executive officers; and (4) approve the Xerox Holdings Corporation 2024 Equity and Performance Incentive Plan (the "Plan").

102.    With respect to the Company's Code of Conduct, the 2024 Proxy Statement stated the following:

> Xerox is committed to the highest standards of business integrity and corporate governance. All of our directors, executives, and employees are required to act ethically under our codes of conduct. In addition, our directors must act in accordance with our Code of Business Conduct and Ethics for Members of the Board; our principal executive officer, principal financial officer, and principal accounting officer, among others, must act in accordance with our Finance Code of Conduct; and all of our executives and employees must act in accordance with our Code of Business Conduct. Each of these codes of conduct can be accessed through our website at xerox.com/governance (under Board Conduct and Ethics), xerox.com/en-us/about/corporate-social-responsibility/finance-code-of-conduct, and xerox.com/governance (under Code of Business Conduct), respectively. Our Corporate Governance Guidelines and the charters of our Audit, Compensation, Corporate Governance, and Finance Committees can be accessed through our website at xerox.com/governance. They are also available to any shareholder who

requests them in writing addressed to Xerox Holdings Corporation, 201 Merritt 7, Norwalk, CT 06851, Attention: Corporate Secretary. We will disclose any future amendments to, or waivers from, provisions of our Code of Business Conduct and Ethics for members of the Board, our Code of Business Conduct, and our Finance Code of Conduct for our officers, on our website as promptly as practicable and in accordance with applicable U.S. Securities and Exchange Commission (SEC) and Nasdaq rules. The Corporate Governance Committee of the Board periodically reviews and reassesses the adequacy of our overall corporate governance, Corporate Governance Guidelines, and committee charters.

103.    Regarding the Board's role in risk oversight, the 2024 Proxy Statement stated the following:

Our Board has ultimate oversight responsibility for our Enterprise Risk Management (ERM) process. The Board oversees our ERM process through the Audit Committee, which previews the ERM assessment and process for subsequent review by the Board. Our ERM process is designed to strengthen our risk-management capability and to assess, monitor, and manage all categories of business risk, including strategic, operational, compliance, and financial reporting. The Company's Chief Financial Officer (CFO) is responsible for the Company's ERM function through the Enterprise Risk Steering Committee, which includes the majority of the direct reports to the CEO, as well as our Chief Information Officer, our Controller, and our Chief Audit Executive. The Enterprise Risk Steering Committee inspects risk mitigation plans and progress, identifies and addresses emerging risks, and shares mitigation best practices across the Company. Additionally, to ensure that ERM is integrated with our business management, the Company's Management Committee, the Business Ethics and Compliance Office, and various internal control committees monitor risk exposure and the effectiveness of how we manage these risks.

While the Board has ultimate oversight responsibility for the risk management process, various committees of the Board have been delegated responsibility for oversight of certain aspects of risk management. In addition to its responsibility to oversee the overall ERM process, the Audit Committee focuses on financial risk, including risks associated with internal control, audit, financial reporting, and disclosure matters, and also on oversight of our Ethics, Litigation, Information, and Cyber Security risk mitigation plans and progress. In addition, the Compensation Committee seeks to incent executive employees in a manner that discourages unnecessary or inappropriate risk-taking, while encouraging a level of risk-taking behavior consistent with the Company's business strategy. In parallel, the Board's Finance Committee oversees aspects of our Global Economy risk, and on an as needed basis, special sub-Committees are established to focus on specific business risks.

We believe that our leadership structure supports the risk oversight function of the Board. Our CEO serves on the Board, and is able to promote open communication between management and directors relating to risk. Additionally, each Board committee is comprised solely of independent directors, and all directors are actively involved in the risk oversight function.

104. With respect to the proposal to approve the Plan, the 2024 Proxy Statement stated

the following, in relevant part:

> In this Proposal 4, the Board of Directors seeks shareholder approval of the Xerox Holdings Corporation 2024 Equity and Performance Incentive Plan (the "2024 Plan" or the "Plan"), including shares to be available for issuance under the Plan. If approved by shareholders, the 2024 Plan will replace the current shareholder-approved Xerox Holdings Corporation Performance Incentive Plan (the "Employee Plan") and the current shareholder-approved Xerox Holdings Corporation 2004 Equity Compensation Plan for Non-Employee Directors (the "Directors Plan," together, the "Current Plans"), resulting in a single plan in which all employees of the Company and its affiliates, and all non-employee directors of the Company, will be eligible to receive awards at the discretion of the Compensation Committee of the Board of Directors (the "Committee").

> The Plan will become effective on May 22, 2024, following approval by the Company's shareholders (the "Effective Date") and the term of the Plan will end upon the tenth anniversary of the Effective Date, or such earlier date as determined by the Committee.

> Shareholder approval of the Plan is sought in compliance with the rules of Nasdaq because the Employee Plan is scheduled to expire on May 20, 2025, and requires shareholder approval of additional shares before such date; and the Directors Plan requires shareholder approval of additional shares before the next awards are granted. Current business practice supports combining the Employee Plan and Directors Plan. The Employee Plan is the only shareholder-approved plan under which equity-based incentive awards are currently granted to the Company's employees, and the Directors Plan is the only shareholder-approved plan under which equity-based awards are currently granted to the Company's non-employee directors.

> This description is qualified in its entirety by reference to the full text of the Plan that is attached to this proxy statement as Annex A.

> ### Background

> The Board of Directors believes that the future success of Xerox will depend, in large measure, on its ability to attract, retain, and motivate executives and non-

employee directors with superior talents, and align their interests with the interests of shareholders.

The Plan replaces the Employee Plan, the Directors Plan, and their predecessor plans (together, the "Predecessor Plans"). Upon adoption of the Plan by shareholders, no further grants will be made under the Predecessor Plans.

The Plan is designed to:

•Enable the Company to issue annual and long-term performance-based awards in order to attract, retain and motivate key employees and non-employee directors; and

•Promote strong alignment between shareholder interests and the objectives of management and non-employee directors.

***

***Determination of Shares to be Available for Issuance***

If the Plan is approved by shareholders the maximum aggregate number of Shares that may be issued under the Plan will be 5,200,000 (all Share numbers are subject to adjustment in accordance with the terms of the Plan).

***The 5,200,000 shares reserved for issuance under the Plan represents an increase of 2,323,357 shares from the number of shares available for awards under the Predecessor Plans as of March 31, 2024.*** If the Plan is approved, no additional awards will be granted under the Predecessor Plans on or after March 31, 2024, but awards outstanding under the Predecessor Plans will remain outstanding in accordance with their terms and the terms of the Predecessor Plans.

In addition, the following Shares will be added to the share reserve under the Plan: Shares underlying outstanding awards granted under the Plan or our Predecessor Plans that expire or are cancelled or forfeited or cash-settled on or after the Effective Date will become available for issuance under the Plan.

105.    Defendants Bandrowczak, Maynard-Elliott, and Letier caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) following a significant reduction in its workforce, Xerox's salesforce underwent a reorganization, which included new territory assignments and account coverage; (2) due to the foregoing, the productivity of Xerox's salesforce was detrimentally impacted; (3) as a result, Xerox experienced a lower rate of sell-through of older products; (4) obstacles arising from Xerox's need to flush out older product would delay the launch of Xerox's core products; and (5) due to the foregoing, the

Company was likely to suffer from lower sales and revenue. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

106.    The 2024 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

107.    As a result of Defendants Bandrowczak, Maynard-Elliott, and Letier causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) elect and/or reelect Defendants Bandrowczak, Bruno, Erwin, Hung, Letier, Maynard-Elliott, McLaughlin, Roese, and Schwetz to the Board, thereby allowing them to breach and/or continue breaching their fiduciary duties to the Company; (2) ratify the appointment of PwC as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve, on an advisory basis, the 2023 compensation of Xerox's named executive officers; and (4) approve the Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

*April 23, 2024 Press Releases*

108.    The truth regarding the effects of the Reinvention began to emerge before the market opened on April 23, 2024, when Xerox issued a press release announcing that the Company had "orchestrated one of its most intense periods of structural change" and revealing that, for the

first quarter of the 2024 Fiscal Year: (1) the Company's quarterly revenue was down 12.4% year-over-year to $1.50 billion; (2) net loss was down $184 million year-over-year and had fallen to -$113 million; and (3) equipment sales declined 25.8% year-over-year to $290 million. In part, Xerox conceded that "***geographic simplification***" had caused the year-over-year decline and further revealed that the Reinvention plan had been "***initially disruptive to sales operations***." However, despite these partial disclosures, the Company maintained its full year 2024 guidance and attempted to ease investors' worries, representing that the guided revenue decline was caused merely by "***headwind[s] from prior-year backlog reduction***" and the "***deemphasis of certain not-strategic revenue.***" In particular, the press release stated the following, in relevant part:

**Q1 2024**

• ***Revenue of $1.50 billion, down 12.4 percent, or 13.2 percent in constant currency***.

• ***GAAP net loss of $(113) million, or $(0.94) per share, a decrease of $184 million or $1.37 per share, year-over-year, respectively.*** This quarter includes after-tax Project Reinvention related charges of $100 million, or $0.80 per share.

• Adjusted net income of $11 million, or $0.06 per share, declined by $71 million or $0.43 per share, year-over-year, respectively.

• Adjusted operating margin of 2.2 percent, 470 basis points lower year-over-year.

• Operating cash flow of $(79) million, lower by $157 million year-over-year.

• Free cash flow of $(89) million, lower by $159 million year-over-year.

* * *

**First-Quarter Key Financial Results**

| (in millions, except per share data) | Q1 2024 | Q1 2023 | B/(W) YOY | % Change B/(W) YOY |
|---|---|---|---|---|
| Revenue | $1,502 | $1,715 | $(213) | (12.4)% AC (13.2)% CC[1] |
| Gross Profit | $443 | $589 | $(146) | |
| Gross Margin | 29.5% | 34.3% | (480) bps | |
| RD&E % | 3.3% | 3.7% | 40 bps | |
| SAG % | 26.4% | 23.7% | (270) bps | |
| Pre-Tax (Loss) Income [2] | $(150) | $85 | $(235) | NM |
| Pre-Tax (Loss) Income Margin [2] | (10.0)% | 5.0% | NM | |
| Gross Profit - Adjusted [1] | $479 | $589 | $(110) | |
| Gross Margin - Adjusted [1] | 31.9% | 34.3% | (240) bps | |
| Operating Income - Adjusted [1] | $33 | $118 | $(85) | (72.0)% |
| Operating Income Margin - Adjusted [1] | 2.2% | 6.9% | (470) bps | |
| GAAP Diluted (Loss) Earnings per Share [2] | $(0.94) | $0.43 | $(1.37) | NM |
| Diluted Earnings Per Share - Adjusted [1] | $0.06 | $0.49 | $(0.43) | (87.8)% |

\* \* \*

## 2024 Guidance

• *Revenue: decline of 3% to 5% in constant currency*

• *Adjusted Operating Margin: at least 7.5%*

• Free cash flow: at least $600 million

Guidance assumes stable Print demand, growth in Digital and IT Services and neutral macroeconomic conditions. ***The guided year-over-year decline in revenue is attributable to the following: around 200 basis points of headwind from prior-year backlog reduction and around 200 basis points from the deemphasis of certain non-strategic revenue, including lower sales of paper.*** Margin guidance implies adjusted operating income margin improvement of more than 190 basis points, and adjusted operating income improvement of more than $100 million, year-over-year.

The company maintains its three-year target of $300 million of incremental adjusted operating income above 2023 levels and a return to double-digit adjusted operating income margin by 2026.

\* \* \*

***Equipment sales of $290 million in the first quarter 2024 declined 25.8% in actual currency, or 26.3% in constant currency1, as compared to the first quarter 2023. The prior year effect of backlog reduction and geographic simplification drove a 16-percentage point year-over-year decline.*** Total equipment revenue outpaced equipment installation activity, due to favorable product mix. Installations declined across all product groups primarily due to prior year backlog reductions. Post-sale revenue of $1.2 billion declined 8.5% in actual currency, or 9.3% in constant currency1, as compared to first quarter 2023. The decline was primarilydue to reductions in non-strategic, lower margin paper and IT endpoint

device placements, as well as the effects of geographic simplification, the termination of the Fuji Royalty and the absence of PARC revenue. Excluding these effects, post sale revenue decreased low-single digits in actual currency.

* * *

Adjusted operating income decreased $85 million as compared to first quarter 2023 due to lower equipment and post sale revenue, including the termination of Fuji royalty income and PARC revenue, lower gross profit and higher bad debt expense, which primarily related to a reserve release in the prior year period. These impacts were partially offset by the cost savings associated with structural simplification efforts.

***We continue to expect a total Revenue decline of 3% to 5% in constant currency in 2024, which includes effects of prior year backlog reductions and the exit of non-strategic businesses***. Core business revenue is expected to be roughly flat year-over-year, reflecting stable Print demand, growth in Digital and IT Services and neutral macroeconomic conditions.

We expect 2024 pre-tax income and adjusted operating income margins to improve in 2024 to approximately 5.1% and at least 7.5%, respectively. These increases will primarily be driven by structural simplification actions enabled by our reorganization, including the effects of the workforce reduction decisions announced in January 2024.

109.    On this news, the price per share of the Company's stock fell $1.66, or 10.11%, from a closing price of $16.42 per share on April 22, 2024 to close at $14.76 per share on April 23, 2024.

110.    Despite this partial emergence of the truth, Defendants continued to mislead investors regarding, among other things, the effects of the Reinvention plan. Indeed, in a press release the Company issued on April 23, 2024 titled "Xerox Statement on Reinventing Production Business," Defendants represented the following, in relevant part:

Xerox's production portfolio continues evolving to best suit our clients' needs.

***Xerox is preparing to discontinue manufacturing of the Xerox® iGen® 5 Press and the Xerox Nuvera® Presses, two legacy platforms that helped create the Production Print industry***. Order fulfillment for iGen and Nuvera is expected to continue through 2024 or while inventory lasts. Xerox will provide industry leading support for these platforms throughout the life of their contracts.

***May 1, 2024 Form 10-Q***

111.    On May 1, 2024, Xerox filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended March 31, 2024 (the "1Q24 10-Q"), wherein the Company affirmed the previously reported financial results. The 1Q24 10-Q represented that Xerox's anticipated full year revenue decline of 3-5% was due to "***effects of prior year backlog reductions and the exit of non-strategic businesses.***" In addition, the 1Q24 10-Q represented that Xerox's equipment sales had decreased year over year as a result of merely "***higher backlog reductions in the prior year quarter.***" With respect to costs associated with Xerox's restructuring, the 1Q24 10-Q also represented the following, in relevant part:

> ***We continue to expect a total Revenue decline of 3% to 5% in constant currency in 2024***, *which includes effects of prior year backlog reductions and the exit of non-strategic businesses*. Core business revenue is expected to be roughly flat year-over-year, reflecting stable Print demand, growth in Digital and IT Services and neutral macroeconomic conditions. In addition, we expect pre-tax income and adjusted operating income margins to improve in 2024, primarily driven by structural simplification actions enabled by our reorganization, including the effects of the workforce reduction decisions announced in January 2024. We continue to expect Operating cash flows to be at least $650 million, which is expected to benefit from a reduction in our finance receivables balance, partially offset by approximately $50 million of higher contributions to our pension plans. Capital expenditures are expected to be approximately $50 million.
>
> * * *
>
> ***Equipment sales revenue decreased 26.0% during the first quarter 2024 as compared to first quarter 2023, reflecting higher backlog reductions in the prior year quarter.*** Backlog declined sequentially by approximately $2 million in the first quarter 2024 as compared to approximately $70 million in the first quarter 2023. Revenue declined across all product groups.
>
> * * *
>
> **Note 11 – Restructuring Programs**
> In connection with our Reinvention and other transformative programs, we engage in restructuring actions in order to reduce our cost structure and realign it to the changing nature of our business. As part of our efforts to reduce costs, our restructuring actions may also include the off-shoring and/or outsourcing of certain operations, services and other functions, exit from certain product lines and geographies, as well as reducing our real estate footprint.
>
> Restructuring and related costs, net reflect the following components:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2024 | 2023 |
| Restructuring charges, net | $ 5 | $ 1 |
| Asset impairment charges, net | 26 | — |
| Related costs, net | 8 | 1 |
| **Total Restructuring and related costs, net** | $ 39 | $ 2 |

***July 25, 2024 Press Release***

112.     On July 25, 2024, Xerox issued a press release announcing its financial results for the quarterly period ended June 30, 2024 ("2Q24"). The press release stated that, although the "comprehensive and strategic operating model changes implemented in Q1 ***caused a short period of disruption***[,]" they "are ***delivering the intended improvements in financial results***." In addition, the press release stated that "[r]evenue declined across all product groups, ***primarily due to the effects of backlog fluctuations in the current and prior year***" and further stated that the guided year-over-year revenue decline was due to merely "***headwind[s] from prior-year backlog reduction***" and the "***reduction in certain non-strategic revenue.***" In particular, the press release stated the following, in relevant part:

> "***The comprehensive and strategic operating model changes implemented in Q1 caused a short period of disruption but are delivering the intended improvements in financial results.*** Adjusted operating income margin, free cash flow and revenue trajectory improved sequentially in Q2***. Momentum in orders, enhanced sales operations and new product initiatives are expected to drive a return to revenue growth in the second half of the year,***" said Steve Bandrowczak, chief executive officer at Xerox. "Q2 results give us confidence Xerox's new operating model, which is more streamlined and closely aligned to the economic buyers of our products and services, is enabling the operating improvements required to deliver an incremental $300 million of adjusted operating income over 2023 levels and a return to double-digit adjusted operating income margin by 2026."

**Second-Quarter Key Financial Results**

**Second-Quarter Key Financial Results**

| (in millions, except per share data) | Q2 2024 | Q2 2023 | B/(W) YOY | % Change B/(W) YOY |
|---|---|---|---|---|
| Revenue | $1,578 | $1,754 | $(176) | (10.0)% AC<br>(9.6)% CC[1] |
| Gross Profit | $520 | $597 | $(77) | (12.9)% |
| Gross Margin | 33.0% | 34.0% | (100) bps | |
| RD&E % | 3.2% | 3.2% | — | |
| SAG % | 24.9% | 24.7% | (20) bps | |
| Pre-Tax Income (Loss)[2] | $25 | $(89) | $114 | NM |
| Pre-Tax Income (Loss) Margin[2] | 1.6% | (5.1)% | 670 bps | |
| Gross Profit - Adjusted[1] | $528 | $597 | $(69) | (11.6)% |
| Gross Margin - Adjusted[1] | 33.5% | 34.0% | (50) bps | |
| Operating Income - Adjusted[1] | $85 | $107 | $(22) | (20.6)% |
| Operating Income Margin - Adjusted[1] | 5.4% | 6.1% | (70) bps | |
| GAAP Diluted Earnings (Loss) per Share[2] | $0.11 | $(0.41) | $0.52 | NM |
| Diluted Earnings Per Share - Adjusted[1] | $0.29 | $0.44 | $(0.15) | (34.1)% |

\* \* \*

## Second Quarter 2024 Overview

In the second quarter of 2024, Xerox progressed in the design, planning and implementation of structural changes that will drive the Company's multi-year Reinvention strategy. ***The intended benefits of the new operating model implemented in the first quarter 2024 are materializing in financial results. In second quarter 2024, adjusted operating income margin, cash flow and revenue trajectory all improved sequentially. These improvements, and ongoing enhancements to management processes, further our confidence that we have the right strategy in place to deliver our targeted $300 million of improvement in adjusted operating income by the end of 2026.***

***Equipment sales of $356 million in the second quarter 2024 declined 15.2%*** in actual currency, or 14.9% in constant currency, as compared to the second quarter 2023. ***The prior year effect of backlog reduction and geographic simplification drove an approximate 14-percentage point year-over-year decline. Total equipment revenue declines outpaced equipment installation activity, due to unfavorable product mix.*** Revenue declined across all product groups, primarily due to the effects of backlog fluctuations in the current and prior year. Post-sale revenue of $1.2 billion declined 8.4% in actual currency, or 7.9% in constant currency, as compared to second quarter 2023. The decline was primarily due to lower outsourcing and service revenue, reductions in non-strategic, lower margin IT endpoint device placements and paper sales, as well as the effects of geographic simplification. Excluding non-strategic effects, post sale revenue decreased mid-single digits.

\* \* \*

## 2024 Guidance Update

•***Revenue: from a decline of 3% to 5% to a decline of 5% to 6% in constant Currency***

•***Adjusted Operating Margin: from at least 7.5% to at least 6.5%***

•Free cash flow: from at least $600 million to at least $550 million

2024 revenue guidance was lowered to reflect additional reductions in non-strategic revenue, including those associated with incremental Reinvention actions. Adjusted operating income margin guidance was lowered primarily to reflect the reduction in revenue guidance, as well as higher-than-expected freight and product costs. Free cash flow guidance was lowered to reflect lower revenue and adjusted operating income margin guidance.

Guidance assumes growing Print demand and growth in Digital and IT Services in the second half of the year. ***The expected year-over-year decline in full-year revenue is attributable to the following: around 200 basis points of headwind from prior-year backlog reduction and 350 basis points from a reduction in certain non-strategic revenue, including lower sales of paper, financing income and Reinvention actions.*** Adjusted Operating Margin guidance implies full-year improvement of at least 90 basis points, primarily reflecting structural reductions in operating expense associated with our Reinvention.

The company maintains its three-year target of $300 million of incremental adjusted operating income above 2023 levels and a return to double-digit adjusted operating income margin by the end of 2026.

***August 1, 2024 Form 10-Q***

113.    On August 1, 2024, Xerox filed its quarterly report on Form 10-Q with the SEC for 2Q24 (the "2Q24 10-Q"), wherein the Company affirmed the previously reported financial results. The 2Q24 10-Q boasted that "[t]he intended benefits of the new operating model implemented in the first quarter 2024 ***are materializing in financial results***." In addition, with respect to the Company's decline in revenue, the 2Q24 10-Q reported that "[r]evenue declined across all product groups, ***primarily due to the effects of backlog fluctuations in the current and prior year***." It also reported that Xerox's "***[c]ore business revenue in 2024 is expected to be roughly flat year-over-year***" as "***consistent with our prior outlook, reflecting growing demand for our products and services in the second half of the year***." Moreover, with respect to the costs associated with Xerox's restructuring, the 2Q24 10-Q stated the following, in relevant part:

**Overview**

In the second quarter of 2024, Xerox progressed in the design, planning and implementation of structural changes that will drive the Company's multi-year Reinvention strategy. ***The intended benefits of the new operating model implemented in the first quarter 2024 are materializing in financial results. In second quarter 2024, adjusted operating income margin, cash flow and revenue trajectory all improved sequentially.*** These improvements, and ongoing enhancements to management processes, further our confidence that we have the right strategy in place to deliver our targeted $300 million of improvement in adjusted operating income by the end of 2026.

***Equipment sales of $356 million in the second quarter 2024 declined 15.2% in actual currency, or 14.9% in constant currency, as compared to the second quarter 2023. The prior year effect of backlog reduction and geographic simplification drove an approximate 14-percentage point year-over-year decline***. Total equipment revenue declines outpaced equipment installation activity, due to unfavorable product mix. ***Revenue declined across all product groups, primarily due to the effects of backlog fluctuations in the current and prior year.*** Post-sale revenue of $1.2 billion declined 8.4% in actual currency, or 7.9% in constant currency, as compared to second quarter 2023. The decline was primarily due to lower outsourcing and service revenue, reductions in non-strategic, lower margin IT endpoint device placements and paper sales, as well as the effects of geographic simplification. Excluding non-strategic effects, post sale revenue declined mid-single digits.

\* \* \*

Due primarily to incremental reductions in revenue associated with geographic simplification and the decision to exit the manufacturing of certain Production equipment, we are lowering our full-year revenue guidance from a decline of 3% to 5% in constant currency to a decline of 5% to 6% in constant currency. ***Core business revenue in 2024 is expected to be roughly flat year-over-year in constant currency consistent with our prior outlook, reflecting growing demand for our products and services in the second half of the year.*** As a result of lower expected revenues, and to a lesser extent rising freight and product costs, we are lowering adjusted operating income margin guidance from at least 7.5% to at least 6.5%. Operating cash flows is now expected to be at least $600 million in 2024 versus prior guidance of at least $650 million. The reduction in operating cash flows is in line with the after-tax reduction in adjusted1 operating income expectations. We continue to expect capital expenditures to be approximately $50 million.

\* \* \*

## Note 11 – Restructuring Programs

In connection with our Reinvention and other transformative programs, we engage in restructuring actions in order to reduce our cost structure and realign it to the changing nature of our business. As part of our efforts to reduce costs, our restructuring actions may also include the off-shoring and/or outsourcing of certain

operations, services and other functions, exit from certain product lines and geographies, as well as reducing our real estate footprint.

Restructuring and related costs, net reflect the following components:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2024 | | | 2023 | 2024 | | | 2023 |
| Restructuring charges, net | $ | 5 | $ | 1 | $ | 10 | $ | 2 |
| Asset impairment charges, net | | (2) | | 12 | | 24 | | 12 |
| Related costs, net | | 9 | | 10 | | 17 | | 11 |
| Total Restructuring and related costs, net | $ | 12 | $ | 23 | $ | 51 | $ | 25 |

114.    The statements in ¶¶110-113 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) following a significant reduction in its workforce, Xerox's salesforce underwent a reorganization, which included new territory assignments and account coverage; (2) due to the foregoing, the productivity of Xerox's salesforce was detrimentally impacted; (3) as a result, Xerox experienced a lower rate of sell-through of older products; (4) obstacles arising from Xerox's need to flush out older product would delay the launch of Xerox's core products; and (5) due to the foregoing, the Company was likely to suffer from lower sales and revenue. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH EMERGES**

115.    The truth fully emerged before the market opened on October 29, 2024 when Xerox issued a press release announcing its financial results for the quarterly period ended September 30, 2024. The press release announced "***lower-than-expected improvements in sales force productivity***" and revealed that "***delays in the global launch of two new products***" had caused "***sales underperformance***." Among other things, Xerox revealed that, for the third quarter of the 2024 Fiscal Year: (1) the Company's quarterly revenue was down 7.5% year-over-year to $1.53 billion; (2) net loss was down $1.3 billion year-over-year, falling to ***$1.2 billion***; and (3) equipment

sales fell 12.2% year over year to $339 million. In addition, the Company revealed that it was substantially reducing its full year guidance, "from a decline of 5% to 6% [] to a decline of around 10%" to reflect "***the delayed global launch of two new products and lower-than-expected improvements in sales force productivity***" and that it would similarly be reducing its adjusted operating income guidance to reflect "the effects of gross profit declines associated with the decline in revenue guidance, and to a lesser extent, delays in the implementation of certain cost reduction initiatives to 2025."

116.    The press release also revealed that "***[d]ue to lower-than-expected revenue in 2024, [it] no longer expect[s] to grow adjusted operating income $300 million above 2023 levels by 2026***" and further stated the following, in relevant part:

**Financial Summary**

**Q3 2024**

• Revenue of $1.53 billion, down 7.5 percent, or 7.3 percent in constant currency.

• GAAP net (loss) of $(1.2) billion, or $(9.71) per share, a decrease of $1.3 billion or $9.99 per share, year-over-year, respectively. This quarter includes an after-tax non-cash goodwill impairment charge of $1.0 billion, or $8.16 per share and a charge to tax expense related to the establishment of a valuation allowance of $161 million, or $1.29 per share.

\* \* \*

**2024 Guidance Update**

• Revenue: from a decline of 5% to 6% in constant currency to a decline of around 10% in constant currency

• Adjusted Operating Margin: from at least 6.5% to around 5.0%

• Free cash flow: from at least $550 million to a range of $450 to $500 million

2024 guidance excludes any impact from the pending acquisition of ITsavvy. ***Revenue guidance was lowered to reflect additional reductions in non-strategic revenue and lower-than-expected equipment sales. Adjusted operating income margin guidance was lowered primarily to reflect the reduction in revenue***

***guidance.*** Free cash flow guidance was lowered to reflect the after-tax impact of lower adjusted operating income margin guidance.

Due to lower-than-expected revenue in 2024, we no longer expect to grow adjusted operating income $300 million above 2023 levels by 2026. However, we continue to expect growth in adjusted1 operating income and a return to double-digit adjusted operating income margin over the course of our Reinvention.

* * *

***Equipment sales of $339 million in the third quarter 2024 declined 12.2% in actual and constant currency, as compared to the third quarter 2023. The effects of fluctuations in backlog in the prior and current years and other Reinvention actions drove approximately 4.0-percentage points of the year-over-year decline. The remainder of the decline primarily reflects the delayed global launch of two new products, lower-than-expected improvements in sales force productivity,*** delays in the timing of installations associated with Hurricane Helene, unfavorable mix, and a large Production equipment sale in the prior year. Total equipment installations increased approximately 17.0% year-over- year, due to growth in entry level equipment.

117.    On an earnings call Xerox hosted the same day to discuss these results, Defendant Bruno, the Company's COO and one of the its directors, disclosed that the product delay was in reality a "forecasting issue" where Xerox "***had higher expectations that we were going to flush through the older product***" which the Company needed to "***sell through***" in order to "make those transitions." In relevant part, Defendant Bruno stated:

[L]et me start with the product transition issue first. ***It's a forecasting issue more than anything else.*** When we look at carried inventory of predecessor products, the timing and the release of new products and the forecasting of that mix, there are a lot of intricacies between the demand to supply signaling. ***We had higher expectations that we were going to flush through the older product, and then the timing of the release of the new product not only to our direct business but also into the channels. As that started to get [indiscernible] through the quarter, we would have a decision to make, and the decision--clearly what we don't want to do is leave a lot of working capital and inventory behind. We want to sell through and make those transitions***.

118.    The same day, Xerox also published an earnings presentation in connection with its third quarter 2024 results. The earnings presentation acknowledged Xerox's "***equipment sales underperformance***" and explained that "***revenue fell short of expectations this quarter due to***

49

*delays in the global launch of two new products and lower-than-expected improvements in sales force productivity.*" In addition, the presentation disclosed that "***delays are expected to affect equipment sales again in Q4***" and further stated the following, in relevant part:

**What drove *equipment sales underperformance* in Q3? What are your expectations for equipment sales in Q4 and 2025?**

***Equipment revenue fell short of expectations this quarter due to delays in the global launch of two new products and lower-than-expected improvements in sales force productivity.*** Tactical challenges associated with the timing of Hurricane Helene, which affected one of our top sales regions during the busiest installation week of the quarter, and an increase in competitive activity in certain markets also contributed to the shortfall. ***Product launch delays are expected to affect equipment sales again in Q4***, but to a lesser extent than in Q3. We have analyzed the factors that contributed to the product launch delays and are confident those factors will be resolved as we recalibrate global launch plans. Further, we expect an increase in sales force productivity in Q4 from ongoing sales efficiency and effectiveness programs. In 2025, we expect to grow market share with new productlaunches, supported by improved global sales and marketing coordination, and improvements in sales force and channel productivity.

\* \* \*

**What factors drove the reduction in 2024 guidance?**

We lowered revenue guidance from a decline of 5% to 6% in constant currency[1] to a decline of around 10% in constant currency. Approximately 75 basis points of the reduction in revenue guidance reflects the incremental effects of intentional reductions in non-strategic revenue. The remainder of the reduction primarily reflects a delay in the global launch of two new products and lower-than-expected improvements in sales force productivity. ***The 150- basis point reduction in adjusted[1] operating margin guidance, to around 5.0%, reflects the effects of gross profit declines associated with the reduction in revenue guidance and, to a lesser extent, delays in the implementation of certain cost reduction initiatives to 2025.*** Free cash flow[1] guidance was reduced from at least $550 million to a range of $450 to $500 million, reflecting the after-tax effects of the reduction in adjusted[1] operating income guidance.

\* \* \*

**How does the reduction in 2024 guidance affect your outlook for 2025 and longer-term Reinvention targets?**

***Due to lower-than-expected revenue in 2024, we no longer expect to grow adjusted operating income $300 million above 2023 levels by 2026.*** However, we continue to expect growth in adjusted1 operating income and a return to double-digit adjusted1 operating income margin over the course of our Reinvention. In 2025, we expect growth in adjusted operating income and margin, supported by a

return to revenue growth and the benefits of additional gross cost savings associated with cost reduction actions implemented in 2024 or expected to be implemented in 2025.

119.    On this news, the price per share of the Company's stock fell $1.79, or 17.41%, from a closing price of $10.28 per share on October 28, 2024 to close at $8.49 per share on October 29, 2024.

## REPURCHASES DURING THE RELEVANT PERIOD

120.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***over $10.8 million*** to repurchase approximately 690,183 shares of its own common stock at artificially inflated prices between January 2024 and October 2024.

121.    According to the 1Q24 10-Q, between January 1, 2024 and January 31, 2024, the Company purchased 646,061 shares of its common stock for approximately $10,311,134 at an average price of $15.96 per share.[6]

122.    As the Company's stock was actually worth only $8.49 per share, the price at closing on October 29, 2024, the Company overpaid by approximately $4,826,076 for repurchases of its stock between January 1, 2024 and January 31, 2024.

123.    According to the 1Q24 10-Q, between February 1, 2024 and February 29, 2024, the Company purchased 3,203 shares of its common stock for approximately $59,384 at an average price of $18.54 per share.

---

[6] Upon information and belief, these repurchases were made during the Relevant Period.

124.    As the Company's stock was actually worth only $8.49 per share, the price at closing on October 29, 2024, the Company overpaid by approximately $32,190 for repurchases of its stock between February 1, 2024 and February 29, 2024.

125.    According to the 2Q24 10-Q, between April 1, 2024 and April 30, 2024, the Company purchased 7,364 shares of its common stock for approximately $127,618 at an average price of $17.33 per share.

126.    As the Company's stock was actually worth only $8.49 per share, the price at closing on October 29, 2024, the Company overpaid by approximately $65,098 for repurchases of its stock between April 1, 2024 and April 30, 2024.

127.    According to the Form 10-Q the Company filed with the SEC on November 4, 2024 for the quarterly period ended September 30, 2024 (the "3Q24 10-Q"), between July 1, 2024 and July 31, 2024, the Company purchased 6,536 shares of its common stock for approximately $75,687 at an average price of $11.58 per share.

128.    As the Company's stock was actually worth only $8.49 per share, the price at closing on October 29, 2024, the Company overpaid by approximately $20,196 for repurchases of its stock between July 1, 2024 and July 31, 2024.

129.    According to the 3Q24 10-Q, between August 1, 2024 and August 31, 2024, the Company purchased 27,019 shares of its own common stock for approximately $273,973 at an average price of $10.14 per share.

130.    As the Company's stock was actually worth only $8.49 per share, the price at closing on October 29, 2024, the Company overpaid by approximately $44,581 for repurchases of its stock between August 1, 2024 and August 31, 2024.

131.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $4.9 million.

## DAMAGES TO XEROX

132.    As a direct and proximate result of the Individual Defendants' conduct, Xerox will lose and expend many millions of dollars.

133.    Such losses include over $4.9 million that the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

134.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

135.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

136.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

137.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments (including payments pursuant to the Plan) provided to the Individual Defendants who breached their fiduciary duties to the Company.

138.    As a direct and proximate result of the Individual Defendants' conduct, Xerox has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

139.    Plaintiff brings this action derivatively and for the benefit of Xerox to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Xerox, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

140.    Xerox is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

141.    Plaintiff is, and has been at all relevant times, a shareholder of Xerox. Plaintiff will adequately and fairly represent the interests of Xerox in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

142.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

143.    A pre-suit demand on the Board of Xerox is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following nine individuals: Defendants Bandrowczak, Bruno, Erwin, Hung, Letier, Maynard-Elliott, McLaughlin, Roese, and Schwetz (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Director-Defendants that were on the Board at the time of the filing of this complaint.

144.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by over $4.9 million for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

145.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted the Company to issue the materially false and misleading statements alleged herein. Specifically, the Director-Defendants caused Xerox to issue false and misleading statements which were intended to make Xerox appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

146.    Pursuant to the 2024 Proxy Statement, Defendants Bandrowczak, Letier, and Maynard-Elliott solicited shareholders to approve the amendments to the Plan to increase the number of shares they could receive for their own benefit. These financial incentives precluded these Director-Defendants from acting in the best interests of the shareholders, as they could not simultaneously request approval of the amended Plan while also failing to provide shareholders with information in the 2024 Proxy Statement regarding the true state of the Company, including the detrimental effects of the Reinvention. Their solicitation, which they materially benefitted from, and the approval of the proposals were based on materially false and misleading statements

and omissions. Moreover, the remaining Director-Defendants are unlikely to take action against Defendants Bandrowczak, Letier, and Maynard-Elliott for their solicitation of the false and misleading 2024 Proxy Statement, since this solicitation allows all of the Director-Defendants to materially benefit from the Plan in the future through the issuance of new shares. The Director-Defendants are thus conflicted from considering a demand against them based on these circumstances as well.

147.    Additional reasons that demand on Defendant Bandrowczak is futile follow. Defendant Bandrowczak has served as the Company's CEO and as a Company director since August 2022. He previously served as the Company's President and COO from 2018 until his appointment as CEO in August 2022. The Company provides Defendant Bandrowczak with his principal occupation for which he receives handsome compensation, including $12,844,686 for the 2023 Fiscal Year.[7] Thus, as the Company admits, he is a non-independent director. As CEO, Defendant Bandrowczak was ultimately responsible for all the Company's false and misleading statements and omissions made during the Relevant Period, including those which he made in press releases and in conference earnings call to investors and analysts. In addition, he signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which resulted in shareholders voting, *inter alia*, to: (1) elect/re-elect the Director-Defendants to the Board, thereby allowing them to breach and/or continue to breach their fiduciary duties to the Company; and (2) approve the Plan, thereby allowing the Director-Defendants to materially benefit thereunder in the future. As the Company's highest officer, he conducted little, if any,

---

[7] The compensation information for every Director-Defendant other than Defendants Bandrowczak, Bruno, Letier, and Maynard-Elliott is not currently publicly available. Plaintiff reserves the right to supplement the amounts of compensation set forth herein as such information becomes publicly available.

oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Further, Defendant Bandrowczak is a defendant in the Securities Class Action. For these reasons, Defendant Bandrowczak breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.    Additional reasons that demand on Defendant Bruno is futile follow. Defendant Bruno has served as a Company director since May 2024 and as the Company's President and COO since 2022. The Company provides Defendant Bruno with his principal occupation for which he receives handsome compensation, including $7,345,309 for the 2023 Fiscal Year. Thus, as the Company admits, he is a non-independent director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Bruno breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149.    Additional reasons that demand on Defendant Erwin is futile follow. Defendant Erwin has served as a Company director since May 2024. She also serves as Chair of the Governance Committee and as a member of the Audit Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets.

For these reasons, Defendant Erwin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

150.    Additional reasons that demand on Defendant Hung is futile follow. Defendant Hung has served as a Company director since May 2024. She also serves as a member of the Governance Committee and the Finance Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Hung breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

151.    Additional reasons that demand on Defendant Letier is futile follow. Defendant Letier is Chairman of the Board and has served as a Company director since 2018. He also serves as Chair of the Finance Committee and as a member of the Governance Committee. Defendant Letier has received and continues to receive handsome compensation for his role as a director, including $340,000 for the 2023 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, he signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which resulted in shareholders voting, *inter alia*, to: (1) elect/re-elect the Director-Defendants to the Board, thereby allowing them to breach and/or continue to breach their fiduciary duties to the

Company; and (2) approve the Plan, thereby allowing the Director-Defendants to materially benefit thereunder in the future. For these reasons, Defendant Letier breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on Defendant Maynard-Elliott is futile follow. Defendant Maynard-Elliott has served as a Company director since 2021. She also serves as Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Maynard-Elliott has received and continues to receive handsome compensation for her role as a director, including $325,000 for the 2023 Fiscal Year. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. In addition, she signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which resulted in shareholders voting, *inter alia*, to: (1) elect/re-elect the Director-Defendants to the Board, thereby allowing them to breach and/or continue to breach their fiduciary duties to the Company; and (2) approve the Plan, thereby allowing the Director-Defendants to materially benefit thereunder in the future. For these reasons, Defendant Maynard-Elliott breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

153.    Additional reasons that demand on Defendant McLaughlin is futile follow. Defendant McLaughlin has served as a Company director since May 2024. He also serves as a member of the Governance Committee and the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false

and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant McLaughlin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154.    Additional reasons that demand on Defendant Roese is futile follow. Defendant Roese has served as a Company director since May 2024. He also serves as a member of the Audit Committee and the Finance Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Roese breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.    Additional reasons that demand on Defendant Schwetz is futile follow. Defendant Schwetz has served as a Company director since May 2024. She also serves as Chair of the Audit Committee and as a member of the Compensation Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Schwetz breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

156.    Additional reasons that demand on the Board is futile follow.

157. Defendants Schwetz, Roese, Erwin, and Maynard-Elliott (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

158. In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

159.    Xerox has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Xerox any part of the damages Xerox suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

160.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

161.    The acts complained of herein constitute violations of fiduciary duties owed by Xerox's officers and directors, and these acts are incapable of ratification.

162.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Xerox. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Xerox, there would be no

directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

163.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Xerox to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

164.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

165.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

167.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

168.    Under the direction and watch of, *inter alia*, Defendants Bandrowczak, Letier, and Maynard-Elliott, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) following a significant reduction in its workforce, Xerox's salesforce underwent a reorganization, which included new territory assignments and account coverage; (2) due to the foregoing, the productivity of Xerox's salesforce was detrimentally impacted; (3) as a result, Xerox experienced a lower rate of sell-through of older products; (4) obstacles arising from Xerox's need to flush out older product would delay the launch of Xerox's core products; and (5) due to the foregoing, the Company was likely to suffer from lower sales and revenue. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

169.    The 2024 Proxy Statement also failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

170.    In the exercise of reasonable care, Defendants Bandrowczak, Letier, and Maynard-Elliott should have known that by misrepresenting or failing to disclose the foregoing material

facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement including, but not limited to, the election/re-election of the Director Defendants and the approval of the Plan.

171.    The false and misleading elements of the 2024 Proxy Statement led to, *inter alia*: (1) the election and/or re-election of all of the Director Defendants to the Board, thereby allowing them to breach and/or to continue breaching their fiduciary duties to Xerox; and (2) the approval of the Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future.

172.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

173.    Plaintiff, on behalf of Xerox, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Violations of Section 20(a)**
**of the Exchange Act**

174.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.    The Individual Defendants, by virtue of their positions with Xerox and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Xerox and each of its officers and/or directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Xerox to engage in the illegal conduct and practices complained of herein.

176.    Plaintiff, on behalf of Xerox, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5
of the Exchange Act**

177.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178.    The Individual Defendants participated in the scheme to defraud with the purpose and effect of defrauding Xerox. Not only is Xerox now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Xerox by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase thousands of its own shares at artificially-inflated prices, damaging Xerox.

179.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged in and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

180.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Xerox not misleading.

181.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control

and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Xerox.

182.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

183.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

184.    Plaintiff, on behalf of Xerox, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

185.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Xerox's business and affairs.

187.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

188.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Xerox.

189.    In breach of their fiduciary duties owed to Xerox, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) following a significant reduction in its workforce, Xerox's salesforce underwent a reorganization, which included new territory assignments and account coverage; (2) due to the foregoing, the productivity of Xerox's salesforce was detrimentally impacted; (3) as a result, Xerox experienced a lower rate of sell-through of older products; (4) obstacles arising from Xerox's need to flush out older product would delay the launch of Xerox's core products; and (5) due to the foregoing, the Company was likely to suffer from lower sales and revenue. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

190.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

191.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

192.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed.

193.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to

maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Xerox's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

194. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

195. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Xerox has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

196. Plaintiff, on behalf of Xerox, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

197. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Xerox.

199. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Xerox that was tied to the

performance or artificially inflated valuation of Xerox or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

200.    Plaintiff, as a shareholder and a representative of Xerox, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

201.    Plaintiff, on behalf of Xerox, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Xerox, for which they are legally responsible.

204.    As a direct and proximate result of the Individual Defendants' abuse of control, Xerox has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Xerox has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

205.    Plaintiff, on behalf of Xerox, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Xerox in a manner consistent with the operations of a publicly held corporation.

208.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Xerox has sustained and will continue to sustain significant damages.

209.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

210.    Plaintiff, on behalf of Xerox, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

211.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

213.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Xerox to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

214.    In addition, the Individual Defendants caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

215.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

216.    Plaintiff, on behalf of Xerox, has no adequate remedy at law.

**NINTH CLAIM**
**Against Defendants Bandrowczak and Heiss for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

217.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

218.    Xerox and Defendants Bandrowczak and Heiss are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Bandrowczak's and Heiss's willful and/or reckless violations of their obligations as officers and/or directors of Xerox.

219.    Defendants Bandrowczak and Heiss, because of their positions of control and authority as officers and/or directors of Xerox, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Xerox, including the wrongful acts complained of herein and in the Securities Class Action.

220.    Accordingly, Defendants Bandrowczak and Heiss are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

221.    As such, Xerox is entitled to receive all appropriate contribution or indemnification from Defendants Bandrowczak and Heiss.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Xerox, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Xerox;

(c)    Determining and awarding to Xerox the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Xerox and the Individual Defendants to take all necessary actions to reform and improve Xerox's corporate governance and internal procedures to comply with applicable laws and to protect Xerox and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Xerox to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Xerox restitution from the Individual Defendants, and each of

them;

       (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

       (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January 14, 2025

                                        **THE BROWN LAW FIRM, P.C.**

                                        */s/ Timothy Brown*
                                        Timothy Brown
                                        Elizabeth Donohoe
                                        Saadia Hashmi
                                        767 Third Avenue, Suite 2501
                                        New York, NY 10017
                                        Telephone: (516) 922-5427
                                        Facsimile: (516) 344-6204
                                        Email: tbrown@thebrownlawfirm.net
                                                          edonohoe@thebrownlawfirm.net
                                                          shashmi@thebrownlawfirm.net

                                        *Attorneys for Plaintiff*

## **VERIFICATION**

 I, Victor LaVallee, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

 I declare under penalty of perjury that the foregoing is true and correct. Executed this 13__ day of January, 2025.

Signed by:

C5468D54566C49C...

Victor LaVallee